No. 86,767

T<span>ELEGRAM</span> P<span>UBLISHING</span> C<span>O</span>., I<span>NC</span>., *Appellee*, v. K<span>ANSAS</span>
D<span>EPARTMENT OF</span> T<span>RANSPORTATION</span>, *Appellant*.

69 P.3d 578

Review of the judgment of the Court of Appeals in 30 Kan. App. 2d 830, 49 P.3d 554 (2002).

Opinion filed May 30, 2003.

*Jeffrey E. Goering*, of Thompson Stout & Goering, LLC, of Wichita, argued the cause, and *Bradley A. Stout*, of the same firm, and *Michael B. Rees*, chief counsel, of the Kansas Department of Transportation, were with him on the briefs for appellant.

*Michael W. Merriam*, of Topeka, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

Nuss, J.: The Kansas Department of Transportation (KDOT) denied Telegram Publishing Co., Inc.'s (Telegram) request for access to the agency's records of hazard ratings for railroad crossings in Finney County, and Telegram filed suit to enforce its request under the Kansas Open Records Act (KORA), K.S.A. 45-215 *et seq.* The district court granted summary judgment in favor of Telegram and later awarded Telegram more than $13,000 in attorney fees and costs. KDOT appealed the award of fees and costs, and the Court of Appeals reversed. *Telegram Publishing Co. v. Kansas Dept. of Transportation*, 30 Kan. App. 2d 830, 49 P.3d 554 (2002). We granted Telegram's petition for review under K.S.A. 20-3018(b).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the Court of Appeals correctly reverse the district court in holding that KDOT's denial of the request was in good faith and with a reasonable basis in fact or law? No.

2. Did the Court of Appeals correctly reverse the district court in holding that a "denial of access" under K.S.A. 45-222(c) refers only to the agency's prelitigation conduct? Yes.

3. Did the Court of Appeals correctly fail to apply sanctions under K.S.A. 2002 Supp. 60-211? Yes.

4. Since the Court of Appeals held that the district court was incorrect in awarding costs under K.S.A. 45-222(c), should costs have been awarded under K.S.A. 60-2002? No.

Consequently, the judgment of the Court of Appeals reversing the district court is affirmed in part and reversed in part. The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings.

FACTS

On June 30, 1998, Catherine Self, a reporter for the newspaper The Garden City Telegram, verbally contacted Al Cathcart, coordinating engineer in the Bureau of Design for KDOT. She requested information on Burlington Northern/Santa Fe Railroad's crossings in Finney County and the hazard rating system for the county. Cathcart supervises the preparation of KDOT's annual report known as the Hazardous Rankings of Railroad Crossings in the State of Kansas.

Cathcart told Self that he would provide information as to the locations of crossings, the identification numbers, the protection, the signal systems in place, the numbers of trains, the annual daily traffic, the physical characteristics of the crossings, the numbers of main lines, and the angles of the crossings. He declined, however, to provide the design hazard ranking, the design ranking, the design rating, or the sight distance. Cathcart advised Self that this information was used to manage a safety program and was protected under federal law, i.e., 23 U.S.C. § 409 (2000).

On or about July 3, Self sent an undated letter to Cathcart's attention as a formal KORA request for information about the priority ranking of highway-railroad crossings and design hazard ratings. KDOT's records indicate the letter was received on July 8, and it was eventually forwarded to KDOT's staff attorney/open records custodian Leslie Spencer-Fowler. According to KDOT, subsequent to July 8, the exact date unknown, KDOT legal assistant Brenda Rhodes contacted Self and discussed Self's request and § 409. Rhodes agreed to provide Self a copy of the text of § 409 but did not. As Self had received no written response by August 3, she sent a second letter to KDOT stating: "After repeated re-

quests, your office has failed to respond on why you cannot provide me with the information mentioned above, and I am again requesting access to those records." Among other things, the letter reminded KDOT of its obligations under KORA, including timely responses to requests. Self requested that "access be granted as soon as possible."

Self's letter was addressed to Rhodes, and by August 12, KDOT attorney Spencer-Fowler had obtained the letter. That same day, Spencer-Fowler sent a responsive letter to Self advising her that KDOT would not disclose the requested information. The letter stated in relevant part:

"Title 23 Section 409 of the United States Code grants a privilege not to disclose information obtained by the Kansas Department of Transportation for use in, or in conjunction with, safety programs. The Department relies on this privilege to the extent that it does not release information or data as to site-specific locations. The priority ranking, which you requested is largely site specific as to the highway crossing, and therefore, the department does not provide that information."

Approximately 2 months later, on October 6, Telegram's legal counsel sent a letter to KDOT requesting the information be released under KORA. The letter stated in relevant part:

"On behalf of my client, I reiterate the demand for access to these records. I cannot agree with your analysis pursuant to 23 U.S.C. § 409. This federal law does not create any privilege with respect to the records in question. While it does provide that the records may not be admitted in federal or state proceedings, it is limited to 'action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists or data.' Finally, the Telegram's request for access to information does not bring this statute into play. Additionally, the fact that information may not be used in a court proceeding does not in any sense exempt it from being public information or subject to the Kansas Open Records Act.

"If you are aware of any facts or law applicable to this request under which you believe access should be denied, please state them to me immediately. I have been authorized to bring an action under the Kansas Open Records Act for access, declaratory relief, costs, attorneys fees and such other relief as is proper.

"I would appreciate your prompt attention to this matter."

No written response was received by Telegram's counsel, but a KDOT legal assistant telephoned him on October 8 and scheduled a conference call with Spencer-Fowler for October 13 at 3 p.m.

Before the conference call occurred, however, KDOT's legal assistant telephoned and cancelled due to Spencer-Fowler's scheduling conflicts. The legal assistant reported that because of a need to consult with superiors, no action would be taken on Telegram's request until at least October 22. There is no indication in the record of any KDOT response after the legal assistant's call.

On October 16, Telegram filed an action in the District Court of Shawnee County, seeking disclosure of the information and alleging that KDOT had violated the provisions of KORA by failing to provide access to public records. Telegram specifically asserted that KDOT had failed to comply with K.S.A. 45-218(d) and asked that it be awarded attorney fees pursuant to K.S.A. 45-222(c). On October 27, Telegram filed an application for peremptory writ of mandamus, which was eventually denied. In KDOT's November 10 motion to dismiss Telegram's mandamus application, attached was an affidavit from Dr. Arland Hicks, acting Secretary of Transportation, which included the following sworn statements:

"5. That the use of accident data is a continuing process.
"6. That the distribution of accident data or prioritization of sites to the general public during the process of analyzation would be disruptive and would limit the agency's ability to fairly recommend the allocation of projects and resources.
"7. That he is aware of 23 U.S.C. 409 and that the statute is very valuable in protecting the agency from unnecessary court liability during the review process.
"8. That he is aware of K.S.A. 45-221 and that the exemptions therein allow the agency to avoid distributing information helpful in assuring competent internal accident-site review without undue outside pressure.
"9. That the protection of 23 U.S.C. 409 and K.S.A. 45-221 are necessary for the free exchange of information and ideas in traffic analysis and project prioritization."

After both sides filed dispositive motions, the district court granted summary judgment in favor of Telegram on February 10, 2000, rejecting KDOT's arguments that because of the federal statute the documents were protected from disclosure under K.S.A. 45-221(a)(1) and (20). In May, Telegram filed a formal motion seeking an award of its attorney fees and costs. On January 17, 2001, the district court awarded attorney fees and costs to Tele-

gram under K.S.A. 45-222(c), holding that KDOT's denial of access to the records was not in good faith and the agency's position was without a reasonable basis in fact or law.

KDOT subsequently appealed the district court's award of attorney fees and costs. The Court of Appeals held that KDOT's interpretation of 23 U.S.C. § 409 provided a reasonable basis in fact or law for denying Telegram access to the agency's hazard rating records. *Telegram Publishing Co.*, 30 Kan. App. 2d at 834-35. The Court of Appeals further held that only KDOT's prelitigation conduct—which it found was not unreasonable—should have been examined when considering the sanctions issue. 30 Kan. App. 2d at 833. The court also rejected all arguments for Telegram's attorney fees and costs under K.S.A. 45-222(c) and reversed the district court's award.

ANALYSIS

The Court of Appeals concluded that because the district court heard no oral testimony and the controlling facts were based on written or documentary evidence appellate review was plenary. We agree. Where the controlling facts are based solely on written or documentary evidence, an appellate court may determine de novo what the facts establish. *Giblin v. Giblin*, 253 Kan. 240, 253, 854 P.2d 816 (1993). Moreover, our review of questions of law is unlimited. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 472, 15 P.3d 338 (2000).

Issue 1: *Did the Court of Appeals correctly reverse the district court in holding that KDOT's denial of the request was in good faith and with a reasonable basis in fact or law?*

Telegram first contends that the Court of Appeals erred in reversing the district court which had held that KDOT's denial of access to the records was not in good faith and the agency's position was without a reasonable basis in fact or law under K.S.A. 45-222(c). This statute, which is part of KORA, provides:

"[T]he court shall award attorney fees to the plaintiff if the court finds that the agency's denial of access to the public record was [1] not in good faith and [2] without a reasonable basis in fact or law. The award shall be assessed against the public agency that the court determines to be responsible for the violation."

KDOT's denial of access must satisfy both elements in order for Telegram to be awarded attorney fees. See *Willis v. Kansas Highway Patrol,* 273 Kan. 123, 133, 41 P.3d 824 (2002).

Addressing these elements requires a review of our approach to KORA. As we recently explained in *Cypress Media, Inc. v. City of Overland Park,* 268 Kan. 407, 416, 997 P.2d 681 (2000):

"[I]t is of prime importance to focus on the overriding public policy of [KORA], which is set forth in K.S.A. 45-216(a) as follows: 'It is declared to be the public policy of the state that public records shall be open for inspection by any person unless otherwise provided by this act, and *this act shall be liberally construed and applied to promote such policy.'*

"Our legislatively directed duty has been previously recognized by our court in *State Dept. of SRS v. Public Employee Relations Board,* 249 Kan. 163, 166, 815 P.2d 66 (1991), where we stated: 'The interpretation of KORA is a question of law and it is our function to interpret the Act to give it the intended effect.' We went on to set forth our duty in the following manner:

'The Kansas Open Meetings Act, K.S.A. 75-4317 *et seq.,* and KORA were passed by the legislature to insure public confidence in government by increasing the access of the public to government and its decision-making processes. This increases the accountability of governmental bodies and deters official misconduct. The public policy stated in KORA is that all records are "open for inspection by any person unless otherwise provided by this act" K.S.A. 45-216(a).' "

Kansas' strong promotion of the policy of openness by its governmental bodies to insure public confidence in them is reiterated in K.S.A. 45-218(a), which provides: "All public records shall be open for inspection by any person, except as otherwise provided by this act."

KORA does contain specific exceptions to disclosure; but like other statutory exceptions, they are to be narrowly interpreted. See *Allen v. Kansas Dept. of S.R.S.,* 240 Kan. 620, 622, 731 P.2d 314 (1987). Consistent with the policy of openness, the burden of proving that an item is exempt from disclosure is on the agency. *State Dept. of SRS v. Public Employee Relations Board,* 249 Kan. 163, 166, 815 P.2d 66 (1991). The KORA exception relied upon by KDOT in this case, K.S.A. 45-221(a)(1), states:

"(a) Except to the extent disclosure is otherwise required by law, a public agency shall not be required to disclose:

(1) Records the disclosure of which is specifically prohibited or restricted by federal law, state statute or rule of the Kansas supreme court or the disclosure of

which is prohibited or restricted pursuant to specific authorization of federal law, state statute or rule of the Kansas supreme court to restrict or prohibit disclosure."

The specific federal law relied upon by KDOT as an exception under K.S.A. 45-221(a)(1) to public disclosure, 23 U.S.C. § 409, states:

"Notwithstanding any other provision of law, reports, surveys, schedules, lists or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal—aid highway funds *shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists or data.*" (Emphasis added.)

In an opinion filed on January 14, 2003, approximately 6 weeks after oral arguments in the instant case, the United States Supreme Court discussed § 409 in *Pierce County v. Guillen,* 537 U.S. 129, 154 L. Ed. 2d 610, 123 S. Ct. 720 (2003). The Court's discussion about the background and purpose of this and related statutes is relevant here.

"Beginning with the Highway Safety Act of 1966, Congress has endeavored to improve the safety of our Nation's highways by encouraging closer federal and state cooperation with respect to road improvement projects. To that end, Congress has adopted several programs to assist the States in identifying highways in need of improvements and in funding those improvements. See, *e.g.,* 23 U.S.C. §§130 (Railway-Highway Crossings), 144 (Highway Bridge Replacement and Rehabilitation Program), and 152 (Hazard Elimination Program). Of relevance to this case is the Hazard Elimination Program (Program) which provides state and local governments with funding to improve the most dangerous sections of their roads. To be eligible for funds under the Program, a state or local government must undertake a thorough evaluation of its public roads. Specifically, [23 U.S.C.] § 152(a)(1) requires them to
  'conduct and systematically maintain an engineering survey of all public roads to identify hazardous locations, sections, and elements, including roadside obstacles and unmarked or poorly marked roads, which may constitute a danger to motorists, bicyclists, and pedestrians, assign priorities for the correction of such locations, sections, and elements, and establish and implement a schedule of projects for their improvement.'

"Not long after the adoption of the Hazard Elimination Program, the Secretary of Transportation reported to Congress that the States objected to the absence of any confidentiality with respect to their compliance measures under § 152. H.R. Doc. No. 94-366, p. 36 (1976). According to the Secretary's report, the States feared that diligent efforts to identify roads eligible for aid under the Program would increase the risk of liability for accidents that took place at hazardous locations before improvements could be made. [Citation omitted.] In 1983, concerned that the States' reluctance to be forthcoming and thorough in their data collection efforts undermined the Program's effectiveness, the United States Department of Transportation (DOT) recommended the adoption of legislation prohibiting the disclosure of information compiled in connection with the Hazard Elimination Program. [Citations omitted.]

"To address the concerns expressed by the States and the DOT, in 1987, Congress adopted 23 U.S.C. § 409, which provided:

'Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled for the purpose of identifying[,] evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway 725 safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be admitted into evidence in Federal or State court or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.' Surface Transportation and Uniform Relocation Assistance Act of 1987, § 132, 101 Stat. 170.

"The proper scope of § 409 became the subject of some dispute among the lower courts. Some state courts, for example, concluded that § 409 addressed only the admissibility of relevant documents at trial and did not apply to pretrial discovery. According to these courts, although information compiled for § 152 purposes would be inadmissible at trial, it nevertheless remained subject to discovery. [Citations omitted.] Other state courts reasoned that § 409 protected only materials actually generated by a governmental agency for § 152 purposes, and documents collected by that agency to prepare its § 152 funding application remained both admissible and discoverable. [Citations omitted.]

"Responding to these developments, Congress amended § 409 in two ways. In 1991, Congress expressly made the statute applicable to pretrial discovery, see Intermodal Surface Transportation Efficiency Act of 1991, § 1035(a), 105 Stat. 1978, and in 1995, Congress added the phrase 'or collected' after the word 'compiled,' National Highway System Designation Act of 1995, § 323, 109 Stat. 591." 537 U.S. at 133-35.

The Supreme Court's lengthy recitation of the historical development of § 409 discloses the federal, state, and local governments' ongoing concern about turning 23 U.S.C. § 152 (2000)—which was

designed to be a safety data compilation and collection statute—into "an effort-free tool in litigation against state and local governments." *Pierce County*, 537 U.S. at 146. This concern is legitimate but totally irrelevant to the instant case because Telegram was not seeking KDOT's information for litigation purposes. Accordingly, the case law cited by KDOT is inapposite. With one exception, the cited decisions all involve the discovery or admissibility of § 409 evidence during litigation. See *St. Louis S.W. Ry. Co. v. Malone Freight Lines*, 39 F.3d 864 (8th Cir. 1994), *cert. denied* 514 U.S. 1110 (1995); *Lusby v. Union Pacific R. Co.*, 4 F.3d 639 (8th Cir. 1993); *Harrison v. Burlington Northern R. Co.*, 965 F.2d 155 (7th Cir. 1992); *Robertson v. Union Pacific R. Co.*, 954 F.2d 1433 (8th Cir. 1992); *Shots v. CSX Transp., Inc.*, 887 F. Supp. 204 (S.D. Ind. 1995); *Kitts v. Norfolk and Western Ry. Co.*, 152 F.R.D. 78 (S.D. W. Va. 1993); *Seaton v. Johnson*, 898 S.W.2d 232 (Tenn. App. 1995); *Fuester v. Conrail*, 1994 WL 463449 (unpublished opinion) (Del. Super. 1994).

The one case involving a request for information without pending litigation is clearly distinguishable from the case at hand. In *Seaton*, 898 S.W.2d at 233, the request was made by an attorney representing the parents of two children killed in a car/train collision who needed the accident history of the crossing and other information to "complete [his] investigation," most likely preparatory to the filing of a wrongful death lawsuit. The request was therefore akin to discovery. Compare *Pierce County*, 537 U.S. at 129, where the parties seeking the intersection safety information under the State of Washington's equivalent to KORA were also the plaintiffs in a wrongful death action arising out of an accident at the intersection and were represented by the same counsel in both endeavors. The Supreme Court accurately described the prelitigation request and the county's refusal to disclose as a "discovery dispute." 537 U.S. at 136.

Since no case law supports KDOT's position of nondisclosure, KDOT also contends that whether a newspaper reporter's request for public records was barred by § 409 is an issue of first impression. Consequently, according to KDOT, its refusal to disclose cannot be "without a reasonable basis in fact or law." We are not

persuaded by this argument, however, because the language of §
409 is clear and unambiguous. See *In re Marriage of Killman*, 264
Kan. 33, 42-43, 955 P.2d 1228 (1998) (When statute is clear and
unambiguous, court must give effect to intention of legislature as
expressed, rather than determine what law should or should not
be.).

Section 409 clearly prohibits disclosure only for discovery or ev-
identiary purposes in a court proceeding or for other purposes in
any action for damages arising from any occurrence at a location
mentioned in the information. Moreover, § 409 must be construed
narrowly. *Pierce County,* 537 U.S. at 130 (citing *Baldrige v. Sha-
piro,* 455 U.S. 345, 360, 71 L. Ed. 2d 199, 102 S. Ct. 1103 [1982]).
Simply put, it contains no prohibitions against disclosure upon a
request by a newspaper reporter, as in the case at hand. Moreover,
KDOT fails in its burden to establish why its records are exempt
from disclosure, since the evidence contains no references to any
litigation for which the newspaper reporter was requesting the in-
formation. See K.S.A. 45-218. Contrast *Seaton,* 898 S.W.2d at 233.

Our conclusion is reinforced by the purpose of KORA. The Act
itself, as well as this court's prior KORA interpretations, reveal that
it is to be liberally construed and applied to promote the public
policy of making public records open for inspection by any person.
See *Cypress Media,* 268 Kan. at 416. Because of this policy of
openness, the exceptions to disclosure are specifically listed, they
are narrowly construed, and the burden of proving that an excep-
tion applies is on the agency. As a government agency, KDOT is
well aware of this strong public policy. Accordingly, a refusal to
allow the public access to records under such a remarkably clear
statute simply because no court in the country has yet required
access under identical circumstances does not provide KDOT a
reasonable basis in law for nondisclosure.

We acknowledge that in *Willis,* 273 Kan. at 133-34, we upheld
the trial court's denial of attorney fees under KORA because,
among other things, the "question presented was one of first in-
stance to our courts." However, *Willis* is readily distinguishable.
We held: "There was a 'reasonable basis in fact or law' for the
KHP's argument" because there was a definite conflict between

K.S.A. 8-1611(b) (which labeled information contained in accident reports as not "privileged or confidential") and KORA (which exempted records of vehicular homicide accidents from disclosure requirements). *Willis*, 273 Kan. at 133-34. Here, there is no such conflict.

Most importantly, as discussed regarding issue 2, KDOT's denial of access to the information was not only without a reasonable basis in fact or law but it was also in bad faith. The district court therefore was correct to award attorney fees under K.S.A. 45-222(c).

*Issue 2: Did the Court of Appeals correctly reverse the district court in holding that a "denial of access" under K.S.A. 45-222(c) refers only to the agency's prelitigation conduct?*

Telegram next contends that the Court of Appeals misconstrued K.S.A. 45-222(c) by holding the district court erred in considering KDOT's litigation conduct when making its determination that the agency's denial of access was not in good faith and without a reasonable basis in fact or law. Telegram also argues the Court of Appeals erred by not sanctioning KDOT's prelitigation conduct.

According to Telegram, a "denial of access" under K.S.A. 45-222(c) is an ongoing process persisting beyond the point at which litigation ensues. Telegram asserts that the Court of Appeals ignored the bad faith actions of KDOT, specifically its constant assertion of new arguments to justify its denial of access after suit was filed and as the case proceeded. As support, Telegram points to the district court's holding: "Defendants made bad faith arguments in defense of this lawsuit. There was no basis in fact or law for the defense." Finally, it argues the Court of Appeals' interpretation of "denial of access" is inconsistent with the liberal interpretation of KORA mandated by the legislature and employed by this court. See, *e.g., Cypress Media,* 268 Kan. at 416-17.

KDOT argues, on the other hand, that a "denial of access" refers solely to an agency's denial of the request for information and does not refer to the conduct of the agency during litigation. According to KDOT, if a request for records is rejected by an agency, the denial is the event that triggers the right to seek enforcement through litigation and, as a result, the Court of Appeals correctly considered only the conduct of KDOT before Telegram filed suit.

The Court of Appeals wrote:

"K.S.A. 45-220 sets forth the procedures for requesting a public document. On request, K.S.A. 45-218(d) gives the custodian three options: (1) grant access to the public record within 3 business days; (2) inform the requestor that access cannot be granted within 3 business days but will be available at a later date; and (3) deny the request within 3 business days. After a denial and a demand by the requestor, the agency must provide a written statement of the grounds for the denial, citing the specific provisions of law under which access is denied.

"By using the words 'denial of access to the public record' in K.S.A. 45-222(c), we hold the legislature was referring to the denial of information as set forth in K.S.A. 45-218(d). Conduct of a party during litigation with respect to asserting good faith positions based on law and fact is governed by K.S.A. 2001 Supp. 60-211. See, *e.g., In re Estate of Winslow,* 23 Kan. App. 2d 670, 677-78, 934 P.2d 1001 (1997).

"We will, therefore, only take into consideration the conduct of KDOT when it denied Telegram *access* to the public record—*before* Telegram filed suit to enforce its KORA request." *Telegram,* 30 Kan. App. 2d at 833.

We agree with the Court of Appeals. Conduct of a party during litigation is governed by K.S.A. 2002 Supp. 60-211, not K.S.A. 45-222. See *McShares Inc. v. Barry,* 266 Kan. 479, 491, 970 P.2d 1005 (1998) (" 'Federal Rule of Civil Procedure 11 grants a court discretion to discipline parties and counsel for conducting litigation in bad faith or in a frivolous and abusive fashion.' ").

Telegram next argues that the Court of Appeals, unlike the district court, failed to properly consider KDOT's prelitigation conduct which, coupled with its refusal to consider KDOT's litigation conduct as sanctionable under K.S.A. 45-222(c), provided Telegram no attorney fees and costs. It argues the Court of Appeals erroneously ignored what Telegram felt was KDOT's unreasonable and unwarranted delay in responding to its KORA requests prior to litigation. Telegram contends that KDOT plainly violated K.S.A. 45-218(d) which, as stated above, establishes an extremely short time line for mandatory response by the agency.

KDOT admits that its response denying access to the records did not occur within the time contemplated in K.S.A. 45-218(d) but asserts there is no evidence the delay was a bad faith deliberate attempt to avoid Telegram's request for information. Further, KDOT argues that its delay in responding to the KORA request

"was a nonissue with the trial court." KDOT contends that the trial court did not award Telegram attorney fees on the basis of inordinate delay but, rather, based on the belief that KDOT's reliance on 23 U.S.C. § 409 constituted a "bad faith argument" in defense of the lawsuit.

As stated earlier, this court determines de novo what the facts establish in this case. The record reveals that on July 8, KDOT received reporter Self's July 3 letter constituting a formal open records request for information. Self's letter was then forwarded to KDOT's open records custodian/staff attorney Spencer-Fowler, but KDOT made no written response within 3 business days following the request in violation of K.S.A. 45-218(d). Actually, Self felt she had received no response whatsoever, so approximately 3 weeks later, on August 3, she sent a second letter reminding KDOT of its KORA obligations and requesting "access be granted as soon as possible." The letter was addressed to a KDOT legal assistant, and Spencer-Fowler obtained it on August 12. That same day, she sent a responsive letter to Self but not within 3 business days following the request, again in violation of K.S.A. 45-218(d).

On October 6, Telegram's legal counsel sent a letter to KDOT requesting the information be released under KORA. No written response was ever received, again in violation of K.S.A. 45-218(d). KDOT's legal assistant did telephone 2 days later, however, and scheduled a conference call for October 13, which KDOT later cancelled. The legal assistant later reported that no action would be taken on the KORA request until at least October 22, *i.e.*, more than 3 months after Self's initial KORA letter and 16 days after Telegram's third written KORA request as contained in the letter from its counsel.

We hold that KDOT's inadequate oral response—which it admits was after July 8—to the July 3 KORA request, its admitted tardy written response on August 12 to the August 3 KORA request, and its hollow oral response to legal counsel's October 6 KORA request, all violated K.S.A. 45-218(d). KDOT's failures to comply regarding the October 6 request are particularly troubling because that letter expressly rejected KDOT's reliance upon § 409, clearly invited KDOT to immediately supply Telegram's legal

counsel with any facts or law which KDOT believed supported its denial of access, and also unequivocally warned that Telegram had authorized legal action—where attorneys fees and costs would specifically be requested—if access continued to be denied. KDOT's drawn out and hollow response is additionally perplexing, since the October 6 letter obviously came from Telegram's legal counsel and requested KDOT's "immediate attention to this matter."

Additionally, it appears from the affidavit of KDOT's acting secretary that the agency was more concerned that public access to the information would be disruptive, bring outside pressure, and inhibit the free exchange of information and ideas in traffic analysis and project prioritization than it was about meeting the letter and spirit of KORA. Since the affidavit was filed less than 1 month after KDOT's questionable efforts to respond to the October 6 letter of Telegram's legal counsel, it can be inferred this attitude played at least a part in KDOT's denials of access to its public records in the summer and fall of 1998. This conduct and attitude together establish bad faith. We reverse the Court of Appeals and hold that Telegram is entitled to attorney fees under K.S.A. 45-222(c) until the time the litigation commenced.

Issue 3: *Did the Court of Appeals correctly fail to apply sanctions under K.S.A. 2002 Supp. 60-211?*

Telegram argues that even though the Court of Appeals erred by failing to consider KDOT's bad faith litigation behavior when reviewing the district court's award of fees under KORA, the appellate court should have applied K.S.A. 2002 Supp. 60-211 to sanction that same conduct. As previously mentioned, conduct of a party during litigation with respect to asserting good or bad faith positions based on law and fact is governed by that statute.

KDOT responds, however, that the Court of Appeals correctly failed to consider whether sanctions were appropriate under K.S.A. 2002 Supp. 60-211, since Telegram never requested such sanctions nor briefed the issue on appeal. We agree with KDOT. The statute expressly provides for sanctions "during the pendency of the action but not later than 10 days after the entry of judgment." K.S.A 2002 Supp. 60-211(c). However, Telegram did not request sanctions un-

der 60-211 at any time, much less within 10 days after entry of judgment, nor did it ever present the matter to the district court. Issues not raised before the district court cannot be raised on appeal. *Dalmasso v. Dalmasso*, 269 Kan. 752, 765, 9 P.3d 551 (2000). Additionally, Telegram failed to brief the issue to the Court of Appeals. Issues cannot be raised for the first time at this level. See *Hephner v. Traders Ins. Co.*, 254 Kan. 226, 231, 236, 864 P.2d 674 (1993). The Court of Appeals was correct in failing to assess sanctions under K.S.A. 2002 Supp. 60-211.

*Issue 4: Since the Court of Appeals held that the district court was incorrect in awarding costs under K.S.A. 45-222(c), should costs have been awarded under K.S.A. 60-2002?*

For its final argument, Telegram contends that although the Court of Appeals denied it an award of costs because K.S.A. 45-222(c) is silent on the issue, the court should have done so pursuant to K.S.A. 60-2002. The Court of Appeals wrote:

"We also reverse the award of costs against KDOT for the same reasons we reverse the award of attorney fees. In addition, K.S.A. 45-222(c) only gives the trial court authority to impose attorney fees; it makes no mention of costs. There is simply no statutory or legal authority for the imposition of costs in this case." *Telegram*, 30 Kan. App. 2d at 835.

Telegram points out that K.S.A. 60-2002(a) states, in part, that "[u]nless otherwise provided by statute, or by order of the judge, the costs shall be allowed to the party in whose favor judgment is rendered." KDOT responds, however, by arguing that Telegram requested the district court award costs solely under K.S.A. 45-222(c) and, consequently, a complaint on appeal that costs should have been awarded pursuant to K.S.A. 60-2002 is based upon invited error. Further, KDOT contends that Telegram never presented its K.S.A. 60-2002 argument to the Court of Appeals.

We agree. Telegram did not raise this issue until the appeal was before this court. Issues cannot be raised for the first time at this level. See *Hephner*, 254 Kan. at 236. Moreover, a party may not invite error and then complain of that error on appeal. *NEA-Topeka v. U.S.D. No. 501*, 269 Kan. 534, 547, 7 P.3d 1174 (2000).

The Court of Appeals was correct in reversing the award of costs against KDOT.

The judgment of the Court of Appeals reversing the district court is affirmed in part and reversed in part. The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings to determine the reasonable amount of attorney fees to which Telegram is entitled before suit was filed.

DAVIS, J., not participating.