**Marilyn MARKS, a resident of the City of Aspen, Colorado, Plaintiff–Appellant,**

v.

**Kathryn KOCH, Clerk of the City of Aspen, Colorado, Defendant– Appellee.**

**No. 10CA1111.**

Colorado Court of Appeals, Div. III.

Sept. 29, 2011.

Robert A. McGuire, Attorney at Law, LLC, Robert A. McGuire, III, Denver, CO, for Plaintiff–Appellant.

John P. Worcester, City Attorney, James R. True, Special Counsel, Aspen, CO, for Defendant–Appellee.

Opinion by Judge FURMAN.

In this proceeding under the Colorado Open Records Act (CORA), sections 24–72–200.1 to –206, C.R.S.2011, plaintiff, Marilyn Marks, appeals the district court's judgment dismissing her case for failure to state a claim upon which relief can be granted, pursuant to the motion filed by defendant, Kathryn Koch, the City Clerk of Aspen (Clerk). We reverse and remand for further proceedings.

## I. The Public Records at Issue

Because of this case's procedural posture, all facts set forth below are derived from Marks's complaint and viewed in the light most favorable to her.

The public records Marks seeks to have released under CORA are 2544 digital copies of ballots cast in the May 2009 Aspen mayoral municipal election, in which Marks was a losing candidate. The copies were created as part of a computerized ballot tabulation system designed for the new instant runoff voting (IRV) procedures of the City of Aspen (City). The IRV procedures were intended to avoid the need for subsequent runoff elections by having voters rank all the candidates and not simply vote for one particular candidate, and then using computer software to determine the winner in a manner simulating an extended runoff voting process.

City engaged TrueBallot, Inc. (TBI), a Maryland corporation, to tabulate the paper ballots under the IRV procedures mandated by City. The new system required Clerk to bring all paper ballots cast by voters to a central location and give them to TBI for tabulation using software designed by TBI to meet the IRV procedures.

TBI's tabulation process had four steps: (1) each paper ballot had to be scanned and the resulting digital photographic image saved as a single computer file in tagged image file format (TIFF) using TBI's software; (2) the software was then used to detect each individual TIFF file's ballot markings to create a raw data string of the voter's rankings of the candidates; (3) the raw data strings were developed into clean data strings; and (4) the clean data strings were interpreted by TBI's software to determine the winner of each race using City's new IRV procedures. Essentially, then, the TIFF files were digital copies of the corresponding paper ballots that voters used to rank the candidates. It is these digital TIFF files that Marks seeks to have released under CORA.

City and TBI took several precautionary steps to assure the integrity of the new computerized tabulation process. They briefly displayed, in whole or in part, each of the 2544 TIFF files on large, public video monitors at the tabulation center at City's city hall; broadcasted selected TIFF files over local television for greater public scrutiny; compared some of the original voter ballots to the data strings those ballots generated, a process open to members of the public; and publicly released both the raw and the clean data strings created by TBI's IRV computer tabulation program.

The record reflects that Clerk, who was then the incumbent clerk for City, was aware of the precautionary measures in place—including the public displaying and broadcasting of the individual TIFF files created from the paper ballots—yet took no action to prevent or alter those measures. Clerk, rather, assisted in the tabulation process by delivering the paper ballots to TBI in a previously agreed-upon manner so that portions of the TIFF files, once created, could be publicly displayed.

Clerk subsequently disclosed that there was a discrepancy between the manual tallies of the paper ballots and TBI's computer-generated data, such that the winner of the mayoral race received more votes than initially stated. Clerk, however, did not publicly disclose this information until nine days after she learned of it—which also happened to be almost a week after the expiration of the statutory deadline to contest the election.

Once Clerk disclosed this information, Marks sought release of all the TIFF files by filing a CORA request with Clerk. Clerk denied Marks' request, asserting that (1) the TIFF files, being duplicates of ballots, were in fact ballots themselves, to be treated in the same manner as the original paper ballots from which they were created; (2) releasing the TIFF files would violate the Colorado Constitution's secrecy in voting requirement, which Clerk interpreted to bar the public disclosure of the contents of ballots; and (3) releasing the TIFF files would also violate section 31–10–616, C.R.S.2011—the ballot storage and destruction provision of the Colorado Municipal Election Code, sections 31–10–101 to –1540, C.R.S.2011—which required Clerk to hold ballots in the ballot box for six months after an election, after which they were to be destroyed.

Marks amended her CORA request to exclude those TIFF files that contained either a write-in candidate or ballot markings Clerk thought might identify a particular voter. Marks' subsequent CORA request was again

denied by Clerk for the same reasons as her initial request.

Marks sought a court order to enforce her CORA request. Marks succeeded in obtaining a preliminary injunction preventing the destruction of the TIFF files pending the resolution of her complaint. The preliminary injunction was extended at Clerk's request to include the paper ballots as well as the TIFF files.

The district court granted a motion by Clerk dismissing Marks' complaint for failing to state a claim upon which relief could be granted. The district court accepted Clerk's argument that (1) the TIFF files were ballots; (2) releasing the TIFF files was prohibited by the Colorado Constitution's secrecy in voting provision; and (3) because the TIFF files were ballots, releasing them was prohibited by the Colorado Municipal Election Code's ballot storage and destruction provision.

Marks appeals the district court's judgment dismissing her claim. Both parties also request appellate attorney fees.

## II. Standard of Review

■ In evaluating a motion to dismiss under C.R.C.P. 12(b)(5), we must accept all averments of material fact as true and view the complaint's allegations in the light most favorable to the plaintiff. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 911 (Colo.1996). Such motions are viewed with disfavor, and "a complaint is not to be dismissed unless it appears beyond doubt that the plaintiff cannot prove facts in support of the claim that would entitle the plaintiff to relief." *Id.*

■ Marks' appeal challenging the dismissal is based on her CORA request seeking release of the TIFF files. In evaluating a claim based on a CORA request, we do so with the understanding that "[o]ur precedent eschews strict attention to form and mandates a content-based inquiry into CORA disclosure exceptions." *Ritter v. Jones*, 207 P.3d 954, 959 (Colo.App.2009). Moreover, exceptions to CORA should be narrowly construed. *Freedom Newspapers, Inc. v. Tollefson*, 961 P.2d 1150, 1154 (Colo.App.1998).

CORA's section 24–72–203(1)(a), C.R.S. 2011, states in relevant part that "[a]ll public records shall be open for inspection by any person at reasonable times, except as provided ... by law." Section 24–72–204, C.R.S. 2011, states in relevant part:

(1) The custodian of any public records shall allow any person the right of inspection of such records or any portion thereof except on one or more of the following grounds ...:

(a) Such inspection would be contrary to any state statute.

Marks contends the right to inspect the TIFF files was not contrary to either (1) the secrecy in voting requirement of article VII, section 8 of the Colorado Constitution; or (2) the Colorado Municipal Election Code. We address each contention in turn.

## III. The Colorado Constitution's "Secrecy in Voting" Requirement

■ Marks contends that because the Colorado Constitution's secrecy in voting requirement extends only to protect the identity of a voter and not the content of his or her ballot—assuming the voter's identity could not be discerned from the content of the ballot—it does not bar the latter from release under CORA. We agree.

Article VII, section 8 of the Colorado Constitution provides in relevant part:

All elections by the people shall be by ballot, and in case paper ballots are required to be used, no ballots shall be marked in any way whereby the ballot can be identified as the ballot of the person casting it. The election officers shall be sworn or affirmed not to inquire or disclose how any elector shall have voted. In all cases of contested election in which paper ballots are required to be used, the ballots cast may be counted and compared with the list of voters, and examined under such safeguards and regulations as may be provided by law. Nothing in this section, however, shall be construed to prevent the use of any machine or mechanical contrivance for the purpose of receiving and registering the votes cast at any election, provided that secrecy in voting is preserved.

■ In giving effect to a constitutional provision, "we employ the same set of construction rules applicable to statutes; in giving effect to the intent of the constitution, we start with the words, give them their plain and commonsense meaning, and read applicable provisions as a whole, harmonizing them if possible." *Danielson v. Dennis,* 139 P.3d 688, 691 (Colo.2006).

The constitutional provision in its fourth sentence uses, but does not define, the phrase "secrecy in voting" by stating that "secrecy in voting" must be preserved, regardless of how the votes cast at any election are received and registered. Because we must read the constitutional provision as a whole, *see Danielson,* 139 P.3d at 691, we look to the prior clauses of the provision, upon which the phrase is dependent, to ascertain the phrase's definition.

The constitutional provision in its first sentence states that "no ballots shall be marked in any way whereby the ballot can be identified as the ballot of the *person* casting it." Colo. Const. art. VII, § 8 (emphasis added). The plain and commonsense meaning of this clause, by virtue of the term "person," clearly indicates that the identity of an individual voter, and any markings on the ballot that could identify that voter, are to be kept secret. *See Danielson,* 139 P.3d at 691.

The constitutional provision in its second sentence states that election officials "shall be sworn or affirmed not to inquire or disclose how any *elector* shall have voted." Colo. Const. art. VII, § 8 (emphasis added). The plain and commonsense meaning of this clause, by virtue of the term "elector," again indicates that an individual voter's identity is to be protected from public disclosure, because this clause coincides with the election officials' viewing of the marked ballots.

Hence, we conclude that the phrase "secrecy in voting," when read in conjunction with the clauses described above, protects from public disclosure the identity of an individual voter and any content of the voter's ballot that could identify the voter. *See Danielson,* 139 P.3d at 691. The content of a ballot is *not* protected, however, when the identity of the voter cannot be discerned from the face of that ballot. To the extent the TIFF files do not reveal a particular voter's identity, then, permitting the right to inspect the TIFF files would not be contrary to the "secrecy in voting" provision of article VII, section 8.

## IV. The TIFF Files Are Not "Ballots"

■ Marks also contends that, because the TIFF files are not ballots, releasing them would not be contrary to the Colorado Municipal Election Code's ballot storage and destruction provision. We agree.

The Colorado Municipal Election Code's provision for the storage and destruction of "ballots" is outlined in section 31–10–616, which provides:

(1) The ballots, when not required to be taken from the ballot box for the purpose of election contests, shall remain in the ballot box in the custody of the clerk until six months after the election at which such ballots were cast or until the time has expired for which the ballots would be needed in any contest proceedings, at which time the ballot box shall be opened by the clerk and the ballots destroyed by fire, shredding, or burial, or by any other method approved by the executive director of the department of personnel. If the ballot boxes are needed for a special election before the legal time for commencing any proceedings in the way of contests has elapsed or in case such clerk, at the time of holding such special election, has knowledge of the pendency of any contest in which the ballots would be needed, the clerk shall preserve the ballots in some secure manner and provide for their being kept so that no one can ascertain how any voter may have voted.

(2) The clerk shall preserve all other official election records and forms for at least six months following a regular or special election.

■ In interpreting a statute, our objective is to effectuate the legislative intent, and all related provisions of an act must be construed as a whole. *Foiles v. Whittman,* 233 P.3d 697, 699 (Colo.2010). To ascertain the legislative intent, we look first to the provision's plain language, giving that language its

commonly accepted and understood meaning. *Id.*

When a statute does not define its terms but the words used are terms of common usage, we may refer to dictionary definitions to determine the plain and ordinary meanings of those words. *People v. Daniels*, 240 P.3d 409, 411 (Colo.App.2009). Because we may presume that the General Assembly meant what it clearly said, however, where the statutory language is unambiguous, we do not resort to further rules of statutory construction to determine the statute's meaning. *Foiles*, 233 P.3d at 699.

Because the May 2009 Aspen mayoral municipal election used paper ballots, we turn to section 31–10–902(1), C.R.S.2011. It states in relevant part: "The clerk of each municipality using paper ballots shall provide printed ballots for every municipal election. The official ballots shall be printed and in the possession of the clerk at least ten days before the election." Therefore, paper "ballots," as the term is used in section 31–10–616, are those paper documents that are to be printed and then possessed by the clerk at least ten days prior to the election. *See Foiles*, 233 P.3d at 699 (concluding that all related statutory provisions must be construed as a whole).

We conclude the TIFF files do not meet these criteria. The TIFF files were created after voters had used paper ballots to indicate their voting preferences and after the polling places were closed. In addition, the TIFF files were wholly or partially displayed to the public through multiple media. Only after this process was completed did Clerk take possession of them.

Other provisions of the Colorado Municipal Election Code bolster our analysis. Section 31–10–902(3)(a)–(c), C.R.S.2011, states:

(a) The ballots shall be printed to give each voter a clear opportunity to designate his choice of candidates by a cross mark (X) in the square at the right of the name. On the ballot may be printed such words as will aid the voter, such as "vote for not more than one".

(b) At the end of the list of candidates for each different office shall be as many blank spaces as there are persons to be elected to such office in which the voter may write the name of any eligible person not printed on the ballot for whom he desires to vote as a candidate for such office; but no cross mark (X) shall be required at the right of the name so written in.

(c) When the approval of any question is submitted at a municipal election, such question shall be printed upon the ballot after the lists of candidates for all offices. The ballots shall be printed to give each voter a clear opportunity to designate his answer by a cross mark (X) in the appropriate square at the right of the question.

The plain language of these provisions indicates that voters are to use the paper ballots to indicate their voting preferences for both candidates and ballot initiatives. The TIFF files, however, were used solely by election officials who, after having created them, retained exclusive possession of them. In contrast with how voters must use paper ballots to indicate their preferences, pursuant to the Colorado Municipal Election Code, the voters in Aspen's May 2009 election did not use the TIFF files for any purpose whatsoever.

Clerk nevertheless contends that section 31–10–616 constitutes a "contrary state statute" pursuant to which the TIFF files must not be released. *See* § 24–72–204(1)(a). We disagree. The first subsection of section 31–10–616, which concerns "ballots," requires (among other things) that the ballots be both retained for six months after the election in which they were cast and destroyed by fire, shredding, or burial, or by any other method approved by the appropriate public officials, when the six months are complete. In contrast, the second subsection, which concerns "other official election records," does not contain such details but rather requires only that such records be "preserve[d] ... for at least six months." § 31–10–616(2). We decline to read into this subsection of the statute any of the intricate procedures required by the first subsection. *See Foiles*, 233 P.3d at 699.

Given our reasoning that (1) section 24–72–204 authorizes the release of public records under CORA absent a constitutional or statutory exception; (2) "secrecy in voting," as

used in article VII, section 8 of the Colorado Constitution, does not exempt the TIFF files from release under CORA, because that constitutional provision protects only the identity of an individual voter and any content of the voter's ballot that could identify the voter; and (3) section 31–10–616 does not exempt the TIFF files from release under CORA because the TIFF files are not "ballots," we conclude the TIFF files are eligible for public inspection under CORA, with the narrow exception of any TIFF file containing content that could identify an individual voter and thereby contravene the intent of article VII, section 8. *See Freedom Newspapers, Inc.*, 961 P.2d at 1154; *cf.* § 31–10–1517, C.R.S.2011 (stating in relevant part, "No voter shall place any mark upon his ballot by means of which it can be identified as the one voted by him, and no other mark shall be placed upon the ballot to identify it after it has been prepared for voting," the violation of which is a misdemeanor).

On remand, the district court shall release the TIFF files to Marks for inspection pursuant to CORA, with the exception of those TIFF files that contain either a write-in candidate or ballot markings that could identify an individual voter. Whether a TIFF file contains ballot markings that could identify an individual voter is a matter within Clerk's discretion to determine.

### V. Parties' Requests for Appellate Attorney Fees

 Marks requests appellate attorney fees pursuant to C.A.R. 39.5 and section 24–72–204(5), C.R.S.2011. Marks has prevailed on appeal and has stated a proper basis on which fees may be awarded to her. C.A.R. 39.5; *see* § 24–72–204(5) ("prevailing applicant" may receive award of attorney fees); *Town of Erie v. Town of Frederick*, 251 P.3d 500, 506 (Colo.App.2010)("A statutory award of attorney fees may include reasonable appellate attorney fees."); *see also Wheeler v. T.L. Roofing, Inc.*, 74 P.3d 499, 506 (Colo. App.2003). Accordingly, Marks is entitled to her reasonable appellate attorney fees. On remand, and upon Marks' application, the district court shall determine the reasonableness of Marks' appellate attorney fees.

Clerk requests appellate attorney fees in the event she successfully defends the C.R.C.P. 12(b)(5) dismissal. Because her defense was unsuccessful, she is not entitled to such fees. *See Wheeler*, 74 P.3d at 506.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

Judge ROY and Judge LICHTENSTEIN concur.